**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

**Case No. 2:26-cv-5950**

LUCKY CREW CORP., an Indiana corporation; RACHEL DUGGAN, an individual; and CHRISTOPHER DUGGAN, an individual,

Plaintiffs,

v.

ZOOM DRAIN FRANCHISE, LLC, a Pennsylvania limited liability company; JAMES N. CRINITI, an individual; and ELLEN ROHR, an individual,

Defendants.

# COMPLAINT

Plaintiffs Lucky Crew Corp., Rachel Duggan, and Christopher Duggan sue Defendants Zoom Drain Franchise, LLC, James N. Criniti, and Ellen Rohr, and allege:

## JURISDICTION AND VENUE

1. The Court has subject matter jurisdiction based on 28 U.S.C. §1332(a), there being complete diversity of citizenship between the parties and the value of the claims exceeds $75,000, exclusive of interest and costs.

2. Plaintiffs Lucky Crew Corp., Rachel Duggan, and Christopher Duggan are citizens and residents of the State of Indiana.

3. Defendant Zoom Drain Franchise, LLC is a Delaware limited liability company with its principal place of business in Plymouth Meeting, Pennsylvania.

4. Upon information and belief, no member of Zoom Drain Franchise, LLC is a citizen

or resident of the State of Indiana.

5. Defendants James N. Criniti and Ellen Rohr are, upon information and belief, citizens of Pennsylvania and Utah, respectively.

6. This Court has supplemental jurisdiction over the claims for relief arising under Indiana law pursuant to 28 U.S.C. §1367(a) because those counts derive from a common nucleus of operative fact, are such that they would ordinarily be expected to be tried in one judicial proceeding, and judicial economy, convenience, fairness, and comity are advanced by trying these claims together as one case.

7. Venue is pleaded in this District solely because the Franchise Agreement executed between the parties contains a venue clause identifying the Eastern District of Pennsylvania as the contractual forum. Plaintiffs expressly reserve all rights, and this filing shall not be construed as an admission of the validity or enforceability of the Franchise Agreement or any of its provisions, including its venue clause, integration clause, or disclaimer provisions. Plaintiffs contend that the Franchise Agreement is void or voidable due to fraud, material misrepresentation, and violations of applicable law, and that the filing of this action in this District is an accommodation only to avoid a jurisdictional dispute and is not a waiver of any right, claim, defense, or remedy. The Indiana Addendum to the Franchise Agreement further provides that Indiana law governs this relationship and supersedes conflicting Pennsylvania provisions to the extent required by Indiana law.

**PARTIES**

8. Plaintiff, Rachel Duggan, is an individual and a resident and citizen of the State of Indiana. She is a principal owner of Lucky Crew Corp. and a guarantor of the Franchise Agreement and related obligations.

9. Plaintiff, Christopher Duggan, is an individual and a resident and citizen of the State of Indiana. He is an owner of Lucky Crew Corp. and a guarantor of the Franchise Agreement and related obligations.

10. Plaintiff, Lucky Crew Corp., is an Indiana corporation. Its principal owners are Rachel Duggan and Christopher Duggan, who are residents and citizens of the State of Indiana.

11. Defendant Zoom Drain Franchise, LLC ("Zoom Drain" or "ZDF") is a Pennsylvania limited liability company with its principal place of business at 500 Davis Drive, Plymouth Meeting, Pennsylvania 19462. Zoom Drain is the franchisor of the Zoom Drain drain and sewer service franchise system.

12. Defendant, James N. Criniti is, upon information and belief, a resident and citizen of the Commonwealth of Pennsylvania. At all relevant times, Defendant James N. Criniti was the Chief Executive Officer of Zoom Drain Franchise, LLC and a founder of the Zoom Drain franchise system.

13. Defendant Ellen Rohr is, upon information and belief, a resident and citizen of the State of Utah. At all relevant times prior to late 2023, Defendant Ellen Rohr served as the Brand President of Zoom Drain Franchise, LLC and was the primary spokesperson of the Zoom Drain franchise system during the period in which Plaintiffs were evaluating and purchasing their franchise.

14. In performing the wrongful acts and omissions alleged herein, each Defendant was the agent, servant, employee or co-conspirator of each other Defendant and each Defendant acted in the course and scope of the agency, service, employment or conspiracy with ratification or approval of the principal, employer and fellow conspirators.

## FACTS

15. Plaintiffs Lucky Crew Corp., Rachel Duggan, and Christopher Duggan are the victims of violations of the FTC Amended Franchise Rule, the Indiana Franchise Act (Ind. Code § 23-2-2.5 et seq.), the Indiana Franchise Relationship Law (Ind. Code § 23-2-2.7 et seq.), and Indiana common law, committed by Zoom Drain Franchise, LLC and its officers and agents.

16. Defendants induced Plaintiffs to purchase a Zoom Drain franchise by making fraudulent representations and material omissions regarding financial performance, investment costs, operational support, the viability of the franchise model, and the health of the franchise system.

17. As a direct and proximate result of those misrepresentations and omissions, Plaintiffs invested in excess of $1,415,376 in personal funds, including an SBA loan, personally guaranteed vehicle leases totaling $448,000, multiple HELOC draws, and sustained out-of-pocket operating losses, in reliance on a business that did not and cannot operate as represented.

18. Despite achieving recognition as one of Zoom Drain's top-ten franchisees systemwide and serving as President of the Franchise Advisory Council ("FAC"), Plaintiffs operated at substantial losses, year-over-year. Lucky Crew generated $1,527,497 in gross revenue in 2025, a 19% year-over-year increase, yet still operated at a personal loss of approximately $125,000 that year alone. Plaintiffs' losses confirm that the deficiencies they experienced are structural and systemic, not the result of operator error.

### A. Fraudulent Misrepresentations and Financial Performance Representations not Contained in Item 19 in the Sales Process

19. During the period from approximately February 2023 through April 2023, Zoom Drain, through its representatives including Brand President, Ellen Rohr, made specific, repeated, and material financial performance representations ("FPRs") to Plaintiffs through direct sales calls,

promotional videos, podcasts, marketing materials, and other direct communications.

20. After working with a franchise consultant and evaluating more than two dozen semi-absentee franchise models over approximately eight months, Rachel Duggan chose Zoom Drain based substantially on these representations.

21. On multiple occasions, Defendants made specific FPRs to Plaintiffs, including Ellen Rohr stating on or about March 2, 2023, March 19, 2023, March 20, 2023, March 29, 2023, April 5, 2026, and April 6, 2026 that: (a) a single Zoom Drain service truck would generate $30,000 to $40,000 per month in revenue; (b) franchisees should expect three to five jobs per day and budget $1,500 to $2,000 in revenue per truck per day; (c) franchisees following the Zoom Drain system would achieve profitability and scale to significant revenue levels within a defined period; and (d) some top technicians earn $60,000 per truck.

22. These representations were made by Ellen Rohr personally, all were repeated on multiple occasions, including some through recorded videos and podcasts that have since been removed from public platforms.

23. None of these FPRs were contained in Item 19 of the FDD, in violation of the FTC Amended Franchise Rule and the Indiana Franchise Act.

24. Zoom Drain consistently marketed the franchise as a “semi-absentee” business model requiring only approximately fifteen (15) hours per week of owner involvement.

25. This representation was central to the sales pitch and a material inducement for Plaintiffs, who sought a franchise investment compatible with their existing careers.

26. Zoom Drain represented that the business could be run by hiring a Service Manager while the franchisee maintained full-time employment elsewhere.

27. References to the semi-absentee model and earning potential of $1,500 to $2,000

per job with three to five jobs per day have since been removed from Zoom Drain's website and promotional materials, upon information and belief because Zoom Drain was aware the representation was false.

28. In reality, the franchise cannot be operated on a semi-absentee basis and instead requires full-time owner involvement, which forced Rachel Duggan to leave a seventeen-year career within months of opening.

29. Ellen Rohr repeatedly characterized the Zoom Drain franchise as the key to "generational wealth" for franchise owners.

30. Zoom Drain also represented its "Calls, Techs, and Trucks" platform as a proven, scalable model in which: (a) regarding Calls, the corporate home office's in-house marketing team would launch a "turnkey, marketing plan proven to drive targeted customer calls" managed for franchisees by the Home Office; (b) regarding Techs, Zoom Drain had "turnkey systems for recruiting, hiring, orienting, training and retaining great team members" and a full-time in-house recruiter to assist franchisees; and (c) regarding Trucks, franchisees would receive fully equipped service trucks with a single-truck revenue potential of $40,000 per month. Each of these representations was materially false and misleading.

31. During the sales process, Ellen Rohr personally represented that Zoom Drain had twenty-two (22) full-time in-house support staff available to franchisees, including: an in-house call center accepting customer inquiries 24/7; a full-time in-house recruiter; dedicated marketing staff; an in-house IT professional; and an in-house accountant.

32. These representations were particularly compelling to Plaintiffs, who had no prior experience in the drain or plumbing industry.

**B. <u>False and Misleading FDD Disclosures</u>**

33. The 2022 FDD provided to Plaintiffs disclosed a total initial investment range of $307,925 to $359,232 for a three-territory franchise.

34. These figures were materially false and grossly understated the actual investment required. Most significantly, the 2022 FDD disclosed vehicle costs of only $13,500 to $16,875 per truck, inclusive of all equipment leases, maintenance, fuel, insurance, and tolls.

35. In reality, each fully equipped and wrapped Zoom Drain service truck cost approximately $185,000, financed through a personal guarantee on a non-terminable Bancorp lease.

36. Zoom Drain required franchisees to obtain a second truck within three months of opening, resulting in Rachel Duggan incurring truck lease obligations of $448,000 for three vehicles.

37. Zoom Drain possessed this information at the time Plaintiffs signed. Just nine days after the April 11, 2023 execution of the Franchise Agreement, Zoom Drain released its 2023 FDD disclosing a revised investment range of $311,602 to $515,796 for three territories, an increase of up to $156,564 that Zoom Drain had withheld from Plaintiffs.

38. Item 7 of the 2022 FDD required franchisees to spend *only a minimum of $1,000* per territory per month on local advertising ($3,000 per month for a three-territory franchisee), with the FDD's own sample P&L using approximately 6% of gross revenue for marketing.

39. These disclosures were materially false and misleading. Zoom Drain knew that a franchisee entering a new market with no brand recognition and no prior industry experience would require marketing expenditures far exceeding the disclosed minimum.

40. Industry standards for new home service businesses call for 10-15% of gross

revenue for advertising. Rachel Duggan spent approximately $287,633 (18.8% of gross revenue) on marketing in 2025 alone and accumulated total marketing expenditures of approximately $498,236 through February 2026, nearly 50 times the FDD minimum, in an effort to generate the calls that Zoom Drain had represented would be driven by the corporate system.

41. Item 19 of the 2022 FDD presented aggregate franchisee and affiliate-owned gross sales data suggesting average revenue of approximately $1,440,429 per year.

42. This figure was materially misleading because it was dominated by affiliate-owned locations and legacy franchisees with pre-existing plumbing customer bases spanning twenty to thirty years, existing plumbing licenses, or acquired pipelining businesses, none of which reflected the economics of a startup franchise in a new market or the territory size of the highest grossing franchisees.

43. The two top-performing system locations achieved their results not through the Zoom Drain system but through: (a) the Philadelphia affiliate's 2021 acquisition of a twenty-year-old pipelining company ("The Pipeshark"); and (b) the New England franchisee's 2021 acquisition of a thirty-year-old pipelining business that nearly doubled their revenue from $2.6 million to $5.8 million.

44. Zoom Drain's own top franchisee acknowledged to FAC members that the success of the New England location "had nothing to do with the Zoom Drain brand."

45. Zoom Drain failed to disclose these distinctions in Item 19, rendering the financial performance data materially false and misleading.

## C. <u>Failure to Deliver the Promised System</u>

46. As of 2025, with purportedly 160 Zoom Drain locations, Zoom Drain has reduced its support staff from the promised twenty-two to approximately seven (7) individuals, a nearly

70% reduction, while the system simultaneously expanded from approximately fourteen (14) franchisees to over fifty.

47. The call center was eliminated entirely, as were the in-house recruiter, IT support, accountant, and multiple marketing positions.

48. The Zoom Drain franchise was sold and marketed as a "niche, essential service" drain cleaning business, a "pure play" drain model, in which franchisees would earn revenue through drain cleaning supported by a corporate plumber referral program.

49. In reality, drain cleaning revenue alone is insufficient to sustain a profitable operation. Franchisees who operate the business as a pure drain cleaning service, as sold and as required by the Franchise Agreement, which strictly prohibits plumbing, quickly discover that drain cleaning revenue does not cover overhead.

50. At no time during the sales process was Rachel Duggan advised that, in order to operate profitably, a franchisee would need to own a separate plumbing company or perform full-service plumbing under the Zoom Drain brand. To the contrary, Zoom Drain marketed and sold the franchise as a standalone, "pure play" drain cleaning business. In reality, the Zoom Drain model cannot exist or sustain profitability as a standalone drain cleaning operation, and the concealment of this fundamental limitation was material to Plaintiffs' decision to purchase the franchise.

51. Zoom Drain's own CEO, James N. Criniti, acknowledged at Zoom Drain's 2025 franchisee conference, "Vortex," that while plumbing was not the brand model, he would encourage owners "to do what they have to do in order to feed their families."

52. Notwithstanding, Zoom Drain simultaneously prohibits franchisees from using plumbing-related search terms in digital marketing and advertising.

**D. <u>Systemic Failure</u>**

53. The systemic failure of the Zoom Drain model is not isolated to Plaintiffs.

54. The FAC, of which Rachel Duggan served as elected President, conducted a 2025 survey of the franchise network that confirmed more than seventy-five percent (75%) of franchisees were at break-even or below.

55. At the October 2025 Vortex annual meeting, Zoom Drain corporate provided the FAC with an internal list of locations it identified as "at risk," which included at least fifteen (15) operational locations.

56. More than twenty-seven (27) locations were internally identified as significantly underperforming or at risk as of early 2026.

57. Rachel Duggan's exemplary performance within the Zoom Drain system makes the systemic nature of the failure unmistakable.

58. Despite ranking consistently among the top franchisees systemwide and being celebrated by Zoom Drain as a model franchisee, Plaintiffs sustained six-figure losses year after year.

59. Specifically: (a) Lucky Crew achieved the highest opening-month revenue of any new franchisee in Zoom Drain history, with over $62,000 in October 2023; (b) Lucky Crew generated $1,238,394 in revenue in 2024 and $1,527,497 in 2025, ranking sixth overall; (c) Rachel Duggan was consistently named in the top ten franchisees systemwide; (d) she received Zoom Drain's Fastest Growth Award, Highest Ticket Award, and All-Star Award at the 2024 Vortex event; (e) she was highlighted by Zoom Drain on LinkedIn for "Women in Franchising" and featured in promotional materials across Meta, LinkedIn, and YouTube; and (f) she was elected FAC President by her peers in November 2024 and served in that role through January 2026.

60. Despite this recognition and over $1.1 million of personal capital invested, Lucky Crew still operated at an annual loss of approximately $125,000 in 2025.

61. The fact that even Zoom Drain's most decorated franchisee, its own "poster child," cannot achieve profitability under the model as represented is compelling evidence that the franchise model is systemically broken and that the representations used to sell it were false.

62. Plaintiffs' reliance on Defendants' representations was reasonable.

63. Plaintiffs had no prior experience in the drain or plumbing industry and were entirely dependent on Zoom Drain for information about the franchise's economic viability.

64. Zoom Drain controlled and possessed all relevant performance data.

65. The representations were made by Zoom Drain's most senior officers, its CEO and Brand President, consistently, repeatedly, and across multiple channels.

66. The FDD itself, while materially misleading, presented the image of a growing, healthy system.

67. Moreover, upon information and belief, Ellen Rohr and Zoom Drain specifically targeted women as prospective franchise purchasers through marketing campaigns and public appearances emphasizing the franchise as a pathway to financial independence and "generational wealth" without prior industry experience.

68. Zoom Drain highlighted Rachel Duggan on LinkedIn for "Women in Franchising" and used her image, story, and "success" as a marketing tool to sell additional franchises while she was incurring mounting personal losses.

69. This targeted marketing to women who lacked prior industry experience constitutes an aggravating circumstance reflecting the willful and predatory nature of Defendants' conduct.

70. As a direct and proximate result of Defendants' misrepresentations and omissions,

Plaintiffs have incurred the following losses: (a) Initial Franchise Fee (3 Territories): $119,500.00; (b) Required Initial Marketing Fee: $45,000.00; (c) Truck lease obligations: $448,000.00; (d) Actual vehicle expenses (2023 through June 30, 2026): $451,784.54; (e) Tools, inventory, and supplies: $37,500.00; (f) Out-of-pocket operating losses: $422,013; (g) Total marketing expenditures through June 30, 2026: $501,616.71; (h) ZDF royalty fees (through June 30, 2026): $30,246.46; and (i) Legal fees: $27,632.50. In total, the amount of damages will be proven at trial and is reasonably anticipated to exceed $2,083,293.21 and to include consequential damages and lost earnings on investment.

71. On January 23, 2026, Plaintiffs, through counsel, issued a Notice of Violation and Demand for Damages to Zoom Drain citing violations of the Indiana Franchise Act, the Indiana Franchise Relationship Law, and the Indiana Deceptive Consumer Sales Act, and demanding rescission of the Franchise Agreement and all related agreements and reimbursement of all damages incurred.

72. Zoom Drain failed to provide the relief demanded.

73. Defendants should be ordered to disgorge and return all monies paid to or received by Defendants from Plaintiffs.

74. On April 14, 2026, the parties engaged in non-binding mediation in an attempt to resolve the dispute, as contemplated by Section 17.1 of the Franchise Agreement, which purports to require that, before commencing any legal proceeding, the dispute first be submitted to non-binding mediation in Plymouth Meeting, Pennsylvania under the then-current CPR Procedure for Resolution of Franchise Disputes.

75. Plaintiffs' participation in mediation was undertaken solely to satisfy any applicable condition to suit and does not constitute an admission or concession of the validity or enforceability

of the Franchise Agreement or any of its provisions, including Section 17.1, all of which Plaintiffs contend are void or voidable as having been procured by fraud, material misrepresentation, and violations of applicable law.

76. The mediation did not resolve the dispute.

**REGULATIONS ON THE SALE OF FRANCHISES**

77. The United States regulates the offer and sale of franchises much as the sale of a secured investment. Franchisors are prohibited from making unfounded projections of financial performance to prospective franchisees by highly-detailed disclosure requirements (intended to provide prospective franchisees with all of the material information needed to make an informed purchase decision).

78. In the 1950s and 1960s, modern franchising exploded as a method of doing business, but sales of franchises were unregulated and subject to widespread abuse. See Bus. Franchise Guide (CCH) ¶ 6302.

79. Thousands of people lost their substantial franchise investments as a result of having been "misled as to the true risks involved in the franchise investment by the franchisor's failure to disclose material facts" concerning franchise offerings. See id. at ¶¶ 6305, 6309.

80. State and federal regulators began to study the situation in the late 1960s and concluded that the sale of franchises was similar to the unregulated sale of securities in the 1920s. The Federal Trade Commission undertook to study misleading practices by franchisors in connection with franchisors' sales of franchised businesses. See Bus. Franchise Guide (CCH) ¶ 6301.

81. As reflected in the FTC's Statement of Basis and Purpose Relating to Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures, Bus. Franchise Guide (CCH) ¶ 6300, et seq., the FTC made the following material findings:

- "[M]isrepresentations and failure to disclose material facts are widespread in franchising." Bus. Franchise Guide (CCH) ¶ 6305.

- "[F]ranchises have been marketed through (A) misrepresentation of material facts relevant to the nature and value of the franchise; (B) unsubstantiated claims regarding the potential sales, income, gross or net profit of franchises; (C) unfair refusal by franchisors to honor refund provisions and (D) failure to disclose material facts about the franchise offering." *Id.*

- Many franchisors have made a practice of making "get rich quick" claims in advertisements and other promotional materials, and "such 'get rich quick' claims frequently either are unsubstantiated by the franchisor, or they misrepresent material facts with regard to the 'potential earnings' of a particular franchise business." *Id.* at ¶ 6304.

- "[T]he record also discloses that many franchisors have highlighted the atypical success of a few franchisees without disclosing the non-representative nature of these claims. Such representations are an unfair and deceptive trade practice." *Id.* at ¶ 6307.

- That said, "For most prospective franchisees there is … no source other than the franchisor for much of the information necessary to make an informed investment decision." *Id.* at ¶ 6304.

- "The record establishes that prospective franchisees are at an informational disadvantage with respect to the franchisor in evaluating the franchise offering because of the setting in which franchises are sold. Because of this informational imbalance prospective franchisees do not have information about material aspects of the franchise and frequently are not even aware that they lack such information. Without such information … prospective franchisees cannot evaluate the value of the franchise offering. The record establishes that franchisors take advantage of the informational imbalance to sell franchises without disclosure of material facts." *Id.* at ¶ 6309.

- "<u>Without such information, prospective franchisees lack material information concerning the prices, the risks, the potential profitability, and even the nature and contents of the franchise offering</u>." *Id.* (emphasis added).

- "[T]he item being offered - the franchise opportunity - is complex, and the information necessary to test the accuracy of representations lies almost solely within the possession of the franchisor. Indeed, even if available, the search costs in obtaining such information would be prohibitive. Accordingly, prospective franchisees, of necessity, have to rely on

the accuracy of the representation of the franchisor as to the profitability of the franchise." *Id.* at ¶ 6307.

- "The failure to disclose material facts concerning the franchise offering, where the prospective franchisee is at an informational disadvantage, violates public policy encouraging informed consumer purchasing decisions." *Id.* at ¶ 6309 (emphasis added).

- "Disclosure requirements are effective means of curbing the 'half-truth' and the failure to disclose used in marketing franchises because they provide prospective franchisees with at least the minimal information needed to make an informed decision whether to enter the franchise relationship. By specifying the type of information which should be provided, the rule prevents franchisors from selectively disclosing only the information which is favorable to them." *Id.* at ¶ 6312.

- Going forward, "[i]f franchisors choose to make representations concerning profits, income or sales to prospective franchisees or in the media," franchisors should be required to make "certain disclosures which are intended to give the prospective franchisee information which will enable him or her to evaluate the merits of the franchisor's claim." *Id.*

82. As a result, by the late 1970s, the sale of franchises came to be regulated in much the same fashion as the sale of securities under SEC Rule 10b-5. In 1979, the FTC adopted a trade regulation rule governing the sale of franchises that is roughly modeled on the SEC Act. See 16 C.F.R. Part 436 (the "FTC Franchise Rule").

83. The FTC's Amended Franchise Rule requires a franchisor to provide a prospective franchisee with certain disclosures in a Franchise Disclosure Document ("FDD") prior to purchase. See 16 C.F.R. § 436.1, et seq.

84. Among the required disclosures: (a) under Item 6, the franchisor must disclose its obligations to furnish assistance in marketing, computer systems, training, and operations; and (b) under Item 19, any financial performance representation must be presented in a detailed format identifying the percentage of existing system units that have achieved the disclosed results, based on written substantiation. The franchisor cannot "disseminate any financial performance representations to prospective franchisees unless . . . the representation is included in Item 19." 16 C.F.R. § 436.9(c).

85. The FPRs described above, including Ellen Rohr's repeated representations that a single truck would generate $30,000 to $40,000 per month, that franchisees should expect $1,500 to $2,000 per truck per day, with three to five calls per day and that the franchise was a semi-absentee business capable of generating "generational wealth," were made outside of Item 19 in violation of the Amended Franchise Rule.

86. Failure to comply with the FTC's Amended Franchise Rule is an unfair or deceptive trade practice in violation of Section 5 of the FTC Act.

87. Indiana requires registration of a franchise opportunity before franchise sales may be made. *See* Ind. Code § 23-2-2.5 *et seq.*

88. The Indiana Franchise Act prohibits any person from making any untrue statement of material fact or omitting any material fact necessary to make a statement not misleading in connection with the offer or sale of a franchise. Ind. Code § 23-2-2.5-27.

*89.* The Indiana Franchise Relationship Law requires franchisors to deal with franchisees in good faith. Ind. Code § 23-2-2.7 *et seq.*

90. The Indiana Deceptive Consumer Sales Act treats a franchise as "services" and prohibits misrepresentations concerning its characteristics, benefits, and quality. Ind. Code § 24-5-0.5-1 *et seq.*

91. A franchisor's FDD must be updated annually within 120 days of the close of the franchisor's fiscal year and quarterly as to material changes. *See* 16 C.F.R. § 436.7(a).

92. Registration must be renewed annually in registration states, including Indiana.

93. Failure to do so precludes franchise sales in those states absent an applicable exemption.

94. Under Indiana law, corporate officers who personally participate in making false representations are individually liable for franchise fraud alongside the corporation. *See Am. Indep. Mgmt. Sys., Inc. v. McDaniel*, 443 N.E.2d 98 (Ind. Ct. App. 1982); *Gable v. Curtis*, 673 N.E.2d 805 (Ind. Ct. App. 1996).

95. Additionally, Ind. Code § 23-2-2.5-29 imposes joint and several liability on any person who materially aids or abets a franchise law violation.

**COUNT I: FRAUD**
**(AGAINST ALL DEFENDANTS)**

96. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

97. Defendants sold Plaintiffs a Zoom Drain franchise based on material misrepresentations and material omissions, as alleged above.

98. Defendants committed fraud by knowingly making false representations to Plaintiffs to induce them to enter into the Franchise Agreement.

99. Direct oral and written communications occurred between Plaintiffs and Defendants, through sales calls, videos, podcasts, and marketing materials, as alleged above.

100. Plaintiffs reasonably relied on Defendants' representations as accurate and complete, given Plaintiffs' lack of prior industry experience, Defendants' superior information and control over all relevant performance data, and the consistent and repeated nature of the representations made by Zoom Drain's most senior officers.

101. The false representations included, without limitation: (a) that a single truck would generate $30,000 to $40,000 per month; (c) that franchisees should budget $1,500 to $2,000 per truck per day with three to five jobs per day; (d) that the franchise required only approximately 15 hours per week of owner involvement; (e) that Zoom Drain had 22 full-time in-house support staff

including a 24/7 call center, in-house recruiter, IT support, dedicated marketing staff, and accountant; (f) that the franchise was a "proven, profitable, scalable" model; (h) presenting materially misleading Item 19 data based on non-comparable legacy franchisees and affiliates; and (i) materially understating initial investment costs and marketing expenditures in Item 7.

102. These misrepresentations and omissions were material facts necessary for an informed investment decision.

103. Only by misrepresenting and concealing them was Zoom Drain able to induce Plaintiffs to enter the Franchise Agreement, personally guarantee vehicle leases, execute an SBA loan, and invest in excess of $2,083,293.21.

104. Plaintiffs suffered and continue to suffer damages, including out-of-pocket losses, capital contributions, extraordinary marketing expenditures, the loss of a seventeen-year professional career, and attorneys' fees.

105. Defendants acted willfully and with oppression, fraud, and malice.

106. They sought to dupe Plaintiffs into entering a Franchise Agreement on false pretenses.

107. The acts were taken, approved, and/or ratified by Zoom Drain's officers, including James N. Criniti as CEO and Ellen Rohr as Brand President.

108. Zoom Drain deliberately targeted women as prospective purchasers and used Rachel Duggan's image, story, and recognition as a marketing tool while she was incurring mounting losses.

109. Even as the system was in widespread failure, Zoom Drain continued to employ the same predatory sales tactics while concealing the true state of the system. Ellen Rohr was removed as Brand President in late 2023 only after allegedly stating "just sue me" to a franchisee in a room

full of other owners, demonstrating Defendants' awareness of the fraudulent nature of their conduct. Punitive damages are warranted.

WHEREFORE, Plaintiffs request judgment, with each item of this prayer being for relief additional to, and alternative to, each other item and not an election of remedies, as follows:

A. Awarding compensatory, incidental, and consequential damages in an amount to be determined at trial, but not less than $2,083,293.21.

B. Awarding restitutionary disgorgement of unjust enrichment.

C. Awarding punitive damages in an amount to be determined at trial.

D. Awarding costs, attorneys' fees, and expenses under Ind. Code § 23-2-2.5-28 and/or the Franchise Agreement.

E. Awarding interest at 8% per annum under Ind. Code § 23-2-2.5-28.

F. Awarding such other and further relief as the Court deems just and proper.

**COUNT II: NEGLIGENT MISREPRESENTATION**
**(AGAINST ALL DEFENDANTS)**

110. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

111. Defendants made false representations and representations by omission to Plaintiffs, including the per-truck revenue FPRs, the representations regarding the semi-absentee nature of the business, the representations regarding 22 support staff and centralized call center infrastructure, the understated Item 7 investment disclosures, and the misleading Item 19 financial performance data.

112. Defendants owed a duty to Plaintiffs to provide accurate FPRs in Item 19, accurate investment cost disclosures in Item 7, and truthful information regarding operational support, infrastructure, and the viability of the franchise model.

113. Defendants breached that duty by stating false revenue benchmarks; making FPRs outside of Item 19; and materially understating investment and marketing costs in Item 7.

114. Defendants knew, should have known, or had reason to know that these statements were false or misleading and that Plaintiffs would rely on them in deciding to purchase the franchise and commit substantial personal capital.

115. Plaintiffs reasonably and justifiably relied on Defendants' misrepresentations given their lack of prior industry experience, Defendants' exclusive possession of material performance information, and the absence of any independent source for the information necessary to evaluate Defendants' representations.

116. As a proximate result, Plaintiffs suffered damages in an amount to be proven at trial, including all amounts set forth above.

WHEREFORE, Plaintiffs request judgment, with each item of this prayer being for relief additional to, and alternative to, each other item and not an election of remedies, as follows:

A. Awarding compensatory, incidental, and consequential damages in an amount to be determined at trial.

B. Awarding restitutionary disgorgement of unjust enrichment.

C. Awarding punitive damages to the extent permitted by applicable law.

D. Awarding costs, attorneys' fees, and expenses under Ind. Code § 23-2-2.5-28 and/or applicable law.

E. Awarding interest as allowed by law.

F. Awarding such other and further relief as the Court deems just and proper.

**COUNT III: UNJUST ENRICHMENT**
**(AGAINST ALL DEFENDANTS)**

117. Pleading additionally and in the alternative, and not as an election of remedies, and to the extent no valid and enforceable contract governs the parties' relationship or Plaintiffs are otherwise without an adequate remedy at law, Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

118. Defendants have benefited from their receipt, acceptance, and use of Plaintiffs' performance under the Franchise Agreement and related agreements, including the initial franchise fee of $119,500, ongoing royalty fees, brand fund contributions, call center fees, technology fees, and all other payments made by Plaintiffs.

119. Those agreements were procured through material misrepresentations and concealment of material facts, as set forth above.

120. Under the circumstances, it would be unjust and inequitable to permit Defendants to retain the benefits of Plaintiffs' performance without full compensation.

WHEREFORE, Plaintiffs request judgment, with each item of this prayer being for relief additional to, and alternative to, each other item and not an election of remedies, as follows:

A. Awarding compensatory, incidental, and consequential damages in an amount to be determined at trial.

B. Awarding restitutionary disgorgement of unjust enrichment.

C. Awarding interest as allowed by law.

D. Awarding such other and further relief as the Court deems just and proper.

**COUNT IV: VIOLATIONS OF THE INDIANA DECEPTIVE CONSUMER SALES ACT (AGAINST ALL DEFENDANTS)**

121. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

122. Plaintiffs are "consumers" as that term is defined under the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-1 et seq. ("IDCSA").

123. A franchise constitutes "services" under Indiana law.

124. Defendant Zoom Drain is a supplier engaged in consumer transactions within the meaning of the IDCSA.

125. Defendants' conduct, including violations of the FTC Franchise Rule, constituted deceptive acts and practices under the IDCSA because the conduct was likely to mislead a reasonable prospective franchisee under the circumstances.

126. Defendants' use of material misrepresentations and omissions regarding financial performance, the semi-absentee nature of the business, the level of corporate operational support, the actual costs of operating the franchise, and the health of the franchise system constitute unfair methods of competition, unconscionable acts or practices, and/or unfair or deceptive acts or practices under the IDCSA.

127. These acts were committed knowingly, willfully, and intentionally.

128. Defendants' deceptive practices were material to Plaintiffs' decision to purchase the franchise, execute an SBA loan, personally guarantee vehicle leases, and invest in excess of $2,083,293.21.

129. James N. Criniti and Ellen Rohr, as officers and representatives of Zoom Drain, actively participated in and exercised control over Zoom Drain's deceptive practices, subjecting them individually to liability under the IDCSA and the Indiana Franchise Act.

130. Under Ind. Code § 23-2-2.5-27, liability extends to "every person" who makes material misrepresentations in connection with the offer or sale of a franchise.

WHEREFORE, Plaintiffs request judgment, with each item of this prayer being for relief additional to, and alternative to, each other item and not an election of remedies, as follows:

A. Awarding compensatory, incidental, and consequential damages, including treble damages to the extent permitted under the IDCSA, in an amount to be determined at trial.

B. Awarding restitutionary disgorgement of unjust enrichment.

C. Awarding punitive damages.

D. Awarding costs, attorneys' fees, and expenses under the IDCSA and Ind. Code § 23-2-2.5-28.

E. Awarding interest at 8% per annum under Ind. Code § 23-2-2.5-28.

F. Awarding such other and further relief as the Court deems just and proper.

**COUNT V: BREACH OF CONTRACT**
**(AGAINST ZOOM DRAIN FRANCHISE, LLC)**

131. Pleading additionally and in the alternative to Plaintiffs' claims for fraud, rescission, and declaratory relief, and not as an election of remedies, and to the extent the Franchise Agreement is found to be valid and enforceable, Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

132. Under the April 11, 2023 Franchise Agreement, Zoom Drain was obligated to provide: (a) an initial training program; (b) continuing advisory assistance; (c) a 24/7 call center pursuant to Section 7.5; (d) marketing and advertising support through the Brand Development Fund, including the specific pre-opening and grand opening marketing commitments in Section 9.3; (e) an accounting of Brand Development Fund contributions under Section 9.1; and (f) the

operational infrastructure, support staff, systems, and resources Zoom Drain represented were in place.

133. Zoom Drain materially breached the Franchise Agreement as follows: (a) Zoom Drain breached Section 7.5 by eliminating its 24/7 call center shortly after Lucky Crew commenced operations, providing no equivalent replacement, and forcing Plaintiffs to hire full-time and part-time call service representatives at substantially greater cost than the 3% of revenue budgeted in Zoom Drain's own cost disclosures; (b) Zoom Drain breached its advisory assistance obligations by systematically eliminating its HR, recruiting, IT, marketing, and accounting support staff, none of which were backfilled, leaving Plaintiffs without the contractually promised support infrastructure; (c) Zoom Drain breached its marketing obligations by failing to deliver the specific pre-opening and grand opening marketing campaigns paid for by Plaintiffs, including a $10,000 billboard campaign, residential direct mail campaigns, an open house and ribbon cutting, and apartment complex postcard campaigns, despite Plaintiffs' $45,000 initial marketing fee payment; and (d) Zoom Drain failed to provide adequate accounting of Brand Development Fund contributions and, upon information and belief, misused those contributions for internal corporate overhead and salaries rather than for advertising and marketing benefiting franchisees.

134. In addition, Zoom Drain repeatedly and without justification interfered with Plaintiffs' Google Business Profile ("GBP"), the primary digital marketing asset and principal driver of inbound customer calls for a local home service business.

135. On multiple occasions, Zoom Drain's actions caused Plaintiffs' GBP to be suspended, removed, or rendered inaccessible, making Lucky Crew effectively undiscoverable on Google Search and Google Maps at critical periods during the development of its business.

136. These actions constitute breach of Zoom Drain's obligations under Sections 9.1 and 9.4 of the Franchise Agreement.

137. Plaintiffs fully performed their obligations under the Franchise Agreement, including payment of all franchise fees, royalty fees, brand fund contributions, call center fees, technology fees, and the $45,000 initial marketing fee. Any nonperformance was waived or excused by Zoom Drain's prior material breaches.

138. As a direct and proximate result of Zoom Drain's material breaches, Plaintiffs have been damaged in an amount to be determined at trial.

WHEREFORE, Plaintiffs request judgment, with each item of this prayer being for relief additional to, and alternative to, each other item and not an election of remedies, as follows:

A. Awarding compensatory, incidental, and consequential damages in an amount to be determined at trial.

B. Awarding costs, attorneys' fees, and expenses as provided by the Franchise Agreement and/or applicable law.

C. Awarding interest as allowed by law.

D. Awarding such other and further relief as the Court deems just and proper.

**COUNT VI: BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING (AGAINST ZOOM DRAIN FRANCHISE, LLC)**

139. Pleading additionally and in the alternative to Plaintiffs' claims for fraud, rescission, and declaratory relief, and not as an election of remedies, and to the extent the Franchise Agreement is found to be valid and enforceable, Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

140. The Franchise Agreement contains an implied covenant of good faith and fair dealing under which each party must not act to deprive the other of the benefits of the agreement.

141. The Indiana Franchise Relationship Law, Ind. Code § 23-2-2.7 et seq., separately and independently imposes obligations of good faith on Zoom Drain as franchisor.

142. Zoom Drain breached the implied covenant and its good faith obligations in the following respects: (a) by systematically eliminating the operational support infrastructure it was expressly and impliedly obligated to provide, including the call center, recruiter, IT support, accountant, and marketing staff, thereby depriving Plaintiffs of the primary benefit of the franchise relationship; (b) by prohibiting franchisees from using plumbing-related search terms in digital marketing while simultaneously being fully aware that the franchise system could not generate sufficient call volume without those terms and accepting royalties on plumbing revenue franchisees were compelled to generate in order to survive; (c) by misusing Brand Development Fund contributions, devoting approximately 43% of Brand Fund revenue to internal marketing staff wages as of 2025 rather than building national brand awareness or driving customer leads, and halting a systemwide website and SEO overhaul the FAC had identified as critical, after being advised by its private equity sponsor that it would not release Zoom Drain from its existing Scorpion contract, thereby prioritizing corporate relationships over franchisee interests; and (d) by taking actions that interfered with Plaintiffs' GBP, rendering Lucky Crew undiscoverable on Google on multiple occasions.

143. Zoom Drain further breached the Indiana Franchise Relationship Law by failing to deal with Plaintiffs equitably, concealing the true state of the franchise system from existing franchisees and the FAC, continuing to sell new franchises while the existing system was in widespread failure, and enforcing contractual provisions in a manner designed to benefit Zoom Drain at the expense of franchisees.

144. As a result of Zoom Drain's breaches, Plaintiffs have suffered damages that will be proven at trial but are reasonably anticipated to exceed $2,083,293.21.

WHEREFORE, Plaintiffs request judgment, with each item of this prayer being for relief additional to, and alternative to, each other item and not an election of remedies, as follows:

A. Awarding compensatory, incidental, and consequential damages in an amount to be determined at trial.

B. Awarding costs, attorneys' fees, and expenses under Ind. Code § 23-2-2.7 et seq. and/or applicable law.

C. Awarding interest as allowed by law.

D. Awarding such other and further relief as the Court deems just and proper.

**COUNT VII: VIOLATIONS OF THE INDIANA FRANCHISE ACT**
**(AGAINST ALL DEFENDANTS)**

145. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

146. Defendants violated the Indiana Franchise Act, Ind. Code § 23-2-2.5 *et seq.*, by intentionally making untrue statements of material fact and omitting material facts necessary to make their disclosures not misleading, including: (a) making FPRs outside of Item 19, including Ellen Rohr's representations that a single truck would generate $30,000 to $40,000 per month; (b) presenting materially misleading Item 19 financial performance data based on non-comparable legacy franchisees; (c) materially understating initial investment and marketing costs in Item 7; (d) misrepresenting the franchise as a viable semi-absentee business model; and (f) misrepresenting the nature, extent, and permanence of the operational support infrastructure.

147. Plaintiffs relied on Defendants' material misrepresentations and omissions in the FDD and in FPRs made outside the FDD.

148. As a direct result, Plaintiffs have suffered damages exceeding $2,083,293.21.

149. Pursuant to Ind. Code § 23-2-2.5-28, Plaintiffs are entitled to recover rescission, consequential damages, interest at 8% per annum, and their reasonable attorneys' fees and costs.\
WHEREFORE, Plaintiffs request judgment, with each item of this prayer being for relief additional to, and alternative to, each other item and not an election of remedies, as follows:

A. Awarding compensatory, incidental, and consequential damages in an amount to be determined at trial.

B. Awarding restitutionary disgorgement of unjust enrichment.

C. Awarding punitive damages.

D. Awarding costs, attorneys' fees, and expenses under Ind. Code § 23-2-2.5-28.

E. Awarding interest at 8% per annum under Ind. Code § 23-2-2.5-28.

F. Awarding such other and further relief as the Court deems just and proper.

**COUNT VIII: RESCISSION AND CANCELLATION OF INSTRUMENT**
**(AGAINST ZOOM DRAIN FRANCHISE, LLC)**

150. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

151. Pleading additionally and in the alternative, and not as an election of remedies, Plaintiffs request rescission of the Franchise Agreement and all ancillary agreements and instruments, including any personal guaranty executed by Rachel Duggan or Christopher Duggan in connection with the Franchise Agreement.

152. Plaintiffs offered to restore to Zoom Drain all consideration received by Plaintiffs, on condition that Zoom Drain restore to Plaintiffs all consideration furnished, including the initial franchise fee, required marketing fees, royalty fees, brand fund contributions, and all other payments made under the Franchise Agreement.

153. Indiana law expressly provides that a party may rescind a contract where consent was obtained through fraud. Ind. Code § 23-2-2.5-28.

154. On balance, Plaintiffs did not receive value commensurate with their investment but instead suffered substantial losses from Zoom Drain's misconduct, while Zoom Drain received substantial monies to be restored.

155. Rescission is warranted on all applicable grounds, including fraud in the inducement, misrepresentation, failure of consideration, and violations of the Indiana Franchise Act and the FTC's Amended Franchise Rule.

156. Service of this Complaint also constitutes a formal demand for rescission.

157. This filing in the Eastern District of Pennsylvania is solely to avoid a jurisdictional dispute arising from the Franchise Agreement's venue clause and shall not be construed as an admission of the validity or enforceability of the Franchise Agreement or any of its provisions.

WHEREFORE, Plaintiffs request judgment, with each item of this prayer being for relief additional to, and alternative to, each other item and not an election of remedies, as follows:

A. Awarding rescission of all contractual obligations between Plaintiffs and Zoom Drain, including the Franchise Agreement and all ancillary agreements, personal guaranties, and instruments.

B. Awarding restitution of all amounts paid by Plaintiffs in connection with the franchise, including all amounts set forth above.

C. Awarding such other and further relief as the Court deems just and proper.

**COUNT IX: DECLARATORY RELIEF**
**(AGAINST ALL DEFENDANTS)**

158. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

159. A dispute exists between the parties in that Plaintiffs contend the Franchise Agreement and ancillary agreements were procured in violation of applicable law, including the FTC's Amended Franchise Rule and the Indiana Franchise Act, and should be rescinded and declared void. Defendants seek enforcement of such agreements.

160. The parties require a judicial declaration concerning the nature of their rights and obligations. Plaintiffs request a declaration that the Franchise Agreement and ancillary agreements were entered into in violation of applicable law and shall be rescinded and/or declared void.

WHEREFORE, Plaintiffs request judgment, with each item of this prayer being for relief additional to, and alternative to, each other item and not an election of remedies, as follows:

A. Awarding a declaration that the parties' agreements and instruments were entered into in violation of applicable law and are rescinded and/or void.

B. Awarding such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a jury trial on all issues so triable.

Dated: August 17, 2026

**THE FRANCHISE FIRM LLP**

By: */s/ Brett M. Buterick*

Brett M. Buterick, Esquire
225 Wilmington West Chester Pike
Suite 200
Chadds Ford, Pennsylvania 19317
Tel: 215.964.1553
*Attorneys for Plaintiffs*